and Ryan Connelly, appellant by David Silberman. Mr. Silberman. May it please the court. Good morning, counsel. Good morning, your honors. This is a post-degree appeal regarding modification of child support pursuant to 750 ILCS 510 of the Illinois Marriage and Dissolution of Marriage Act. By way of a brief background and some significantly legal facts to go along with the background, the parties entered into a custody judgment on January 25, 2015. That custody judgment awarded both parties joint custody at that time. I know the law has changed now. But at that time awarded joint custody to the parties with Ms. Connelly being awarded the residential parent and my client being awarded certain parenting time back then known as visitation, which included alternating weekends and time during the week. That amount of parenting time at the time in 2015 equals 115 overnights per year. The parties three months later were divorced by way of an agreed marital settlement agreement. And that was done on September 30, 2015. Pursuant to the terms of the marital settlement agreement, Mr. Connelly was a W-2 employee, and he also had the ability to earn commissions and bonuses. Pursuant to the statute at the time for 505, the law in effect was that the payors' non-residential parents' income would be calculated at the rate of 28% of their net income. That's why Mr. Connelly was agreed in order to pay the amount of $1,550 per month as in for child support. Within that provision of child support, it also contains a supplementary clause that states, in addition to a fixed percent of the net of any future bonus, commission, or additional income over his then annual base income of $100,000. The reason why I mention the additional income from reading Ms. Connelly's reply brief is because when we discuss additional income in the Domestic Relations Division, we look to paragraph 11 of the financial affidavit, which provides one and a half pages of additional forms of income, whether it is by tips, bonus, pension, retirement, annuity, trust income, unemployment benefits, investment income, rental income, it goes on and on and on. Subsequent to the entry of... So with regards to the bonuses and commissions that my client received after 2015, there was a true-up provision, and that true-up provision was based on 28% of that amount of money based on his tax effect at that time. Now, fast forward to May 2016, my client, Mr. Connelly, had filed a petition to increase and modify his parenting time. The parties were sent to mediation. It was unsuccessful, but then they entered into an agreed order without the aid or assistance of court. That agreed order provided my client with an additional 31 overnights of visitation, an additional almost four and a half weeks when we look at the calendar, which we'll see set forth in the brief in a few pages. Now, Mr. Connelly, on October 20, 2017, filed an amended petition to modify child support. Primarily, he alleges three specific reasons to modify child support under Section 510. The first is that he had an increase in his base salary. His base salary was $100,000, and he received a 10% increase, thereby making his base salary now $110,000. The second factor was an increase in Ms. Connelly's income, which increased by almost 50% from the time of the entry of the judgment in 2015. So it went from roughly at one point $60,000 to over $100,000. Is that because of the inheritance? It's because of the dividends and interest income due to the inheritance and a little less than $20,000 as a raise from her employment income. So there would be $40,000 roughly, 20 attributable to her employment income, $20,000 attributable to the dividend and or interest income. You were certainly aware that she was going to get a substantial amount of money. I'm sorry? You were certainly aware that she was going to get a substantial amount of money from this inheritance. Correct. At the time of her birth. Correct. Pursuant to 503 of the Illinois Marriage and Dissolution of Marriage Act, she was awarded her non-marital estate. So Mr. Connelly had no claim on that estate. Right. But he was well aware that she was going to get a substantial amount of money. Correct. But the next, I believe, the next logical question, which is littered throughout the brief, is whether or not the one document that was introduced into evidence with regards to a Morgan Stanley account from 2014 that states that she may receive speculative unknown payments when she received her inheritance. She could have done anything she wanted with it. She could have sold all the securities. She could have purchased a house. She could have taken all the money and done anything she wanted. So there was never a point in time where there was a discussion on the record, off the record, with regards to Ms. Connelly's dividend income, and that's why it wasn't contemplated in the terms of the marital settlement agreement. But were we talking about maintenance or child support? Child support, Your Honor. So how really relevant is her income to his duty to support his child? At this point in time, when we look at the totality of circumstances as it relates to both parties' income under a shared physical custody model, it's very relevant. Let's suppose they're both millionaires. Let's say they both make a million dollars a year. She's got plenty of them. He doesn't have to pay the dollars for it. No, there would be. Are you talking under 505 now or 505 in general? Pick one. Okay. I'll do both. Is that okay? So under 505, if they both had a million dollars of income, employment income, then there certainly would be a question for the court to deviate or modify from the child support guidelines at 28%. Under the current child support law, I know that there's a cap at $500,000, but neither one of them are close to that with regards to their income combined. So the point of the new 505 is to put more parity between the parties as it relates to not only their income but the amount of time that they spend with the children. So the third issue, which doesn't so much deal with finances but it has a hook on finances, would be the additional parenting time that Mr. Connolly was granted, which includes over 31 overnight to increase it 25% of his time. We alleged that that additional time, obviously with the children one-on-one, that his direct and indirect expenses increased as a result of taking care of the children during that time. Was that a contested motion? It actually was unrebutted testimony. No, no, no. The original change that you were going to do, what was it? It was 30 at the time. It was... I'm sure they have some more. She said yes. Mr. Connolly had to file a petition because the parties didn't reach an agreement. When they didn't reach an agreement by way of local court rule, they were ordered to mediation. Mediation failed. Then Mr. Jumbeck and I, along with the parties, negotiated an out-of-court settlement whereby the court did not interject with regards to the parenting time that the parties had selected to move forward, which provided, again, Mr. Connolly with an additional month of parenting time. Mr. Connolly, had the new amendment to the divorce law been in effect, or were they in effect at the time that the study of agreement was reached? The new parenting time schedule? Yes. The new parenting time schedule was entered in August of 2016, which was more than 14 months after the original joint custody agreement was entered. So it was the... Was it after the new amendments to the resolution? No. To 2505? No. It was before. What evidence did your client provide the court with respect to his increased expenses by virtue of custody days? So, as I mentioned shortly, he had testified specifically that, and it was unprovided by Ms. Connolly, that the very specific expenses that he had paid or was incurring as a result of having the children more often were the purchase of clothing, groceries, dinners out, dining out with the children and friends, household expenses, entertainment, additional daycare in the summer, because during the summer they have a different agreement whereby he has more consecutive days in a row. I think it would be three days in a row. I have to look at the schedule. And then gasoline, utilities, activities, memberships. So it was more because he's having the children on not just every other weekend, one day during the week, but much more substantial time, especially on an overnight basis. He's providing the expenses that Ms. Connolly was providing, but now is being shifted in terms of not only the paradigm of parenting time, but also the cost savings that Ms. Connolly is incurring, because Mr. Connolly is absorbing those additional costs when he's with the children. The judge's order of March 5th, 2018, specifically states that when addressing Ryan's position that his increased income represented a substantial change, the trial court noted Illinois now uses an income shares approach to child support. In Ryan's case, the use of the income shares would result in a decrease in guideline support. So in essence, the court was looking at the effect of the ruling to dictate and determine whether or not a substantial change in circumstances occurs. So putting the cart before the horse. It should be the analysis is under 510, is there a substantial change in circumstances? And if there is a substantial change in circumstances, based on Mr. Connolly's increase of $10,000, Ms. Connolly's increase in employment income of nearly $20,000, her dividend income over $20,000, so roughly $40,000, and my client's exercise of an additional 31 nights of overnight parenting time, all of those factors combined in the totality of circumstances under 510, is that sufficient to move forward beyond a directive finding, which the trial court had done after my case in chief? And that's why as part of the, I'm sorry, that's why I had drafted specifically on page 13 of the brief that a plain reading of the trial court's order of March of 2018, evidence is, in my opinion, a manifest intent to reject 505 as amended on July 1st, 2017, and render the establishment of a substantial change beyond my client's, beyond Mr. Connolly's reach, because of this preconceived notion that we're looking at the effect of what happens versus is there a substantial change in circumstances. Thank you very much. Thank you. Thank you. Mr. Johnbeck. May it please the court, Mr. Subramanian. This is, interestingly, this case isn't quite as black and white as some matrimonial cases may at times be, because we're now in a situation where you are the second appellate court thus far that's dealt with the issue that has been prevalent since July 1st of 2017 of the new rubric of child support and what constitutes a substantial change in circumstances. It is very clear under the old law, typically we're looking at the payor's income going up and the payee having to demonstrate some type of a minor, as some cases would say, those still substantial change in circumstances to justify the modification of child support. And whether that be a presumption that the kids are two years older so they eat more or they're in larger activities, the case law previously was a little bit not necessarily clear. We never really got much into what the real substantial change in circumstances was. When the legislature amended Section 505 and obviously Section 510 consistent with that, it included provisions that demonstrate that there has to be some change other than the new statute going into effect in order for prior child support judgments to be modified by using the new mathematical formula or equation to determine child support. And the reason that that is there, presumptively, is to avoid an influx of every, generally speaking, male who had a prior child support obligation running in on July 2nd of 2017 and thereafter vowing motion to modify child support based upon, well, she wasn't working at the time of the entry of the judgment, she's not working, nobody paid attention to that then, but she is now, she's making $10,000 as opposed to zero, substantial change, my child support goes down in most circumstances. I understand it's somewhat generalizing, but that's in essence the effect that this new statute had and it's realistically why the legislature likely, it's not in their heads, put in the provisions in 510 that there has to be something else change. In other words, it's clear that just because the statute changed, that cannot alone justify change. Correct. So now it's become, I would say, commonplace in the domestic relations practice to try to find any type of a change in circumstances to try to get your client to get a reduction, even if their income has expanded. That's exactly what Mr. Connolly tried to do here, and in this case a little bit more interesting when we start dealing with the three different arguments which they laid out both before the trial court and before this court. Number one, his income going up. With all due respect to Mr. Silverman, I have had plenty of cases with Mr. Silverman, this one being probably the longest lasting case. There is nothing in the marital settlement agreement that states that income is defined as in the financial declaration. And we know by default that's true because the financial declaration wasn't implemented by the Illinois Supreme Court in the changes in the statute until January 1st of 2016. This is a 2015 judgment. So there's absolutely no claim that can be made. And the marital settlement agreement is clear and unambiguous. It says performance bonus, additional income, period. So the increase in his base income is already dealt with. And Judge Bertani is the judge who heard the prove-up in this matter, and I cite within my brief his exact statement during the course of the prove-up because the transcript was filed of this is by definition a 28% order because it dealt with all of those potential increases that he had in his income. Is prove-up a phrase used? Yes, it is. That would be the most commonly known phrase. Yes, it is. Now prove-up. True-up. So it's a prove-up that occurs for the judgment to be answered. True-up is the provision that we use for, for example, somebody like Mr. Connelly who they have a base income or somebody who's in sales, a business owner. The true-up is, okay, let's set a reasonable support amount so that presumably mom, payee, and the children have a base amount of support, but dad isn't having to rely on his commissions from two years ago in order to pay his child support, and if they don't come, then we're back in court. The entire theory of a true-up provision, as is in this marital settlement agreement, is to avoid the litigation over these things and to argue that his base income increase of 10%, which Judge Osterberger dealt with separately. She said, I find that even that 10% increase isn't a substantial change in circumstances, whether under the old law or under the new law. And not only that, she definitely didn't think it was a substantial change in circumstances so as to initiate the new analysis under the new amended 505 in Section 510. The next argument that is made is dealt with as it relates to my client's income and her increase of income. And, Justice Slitton, you posed the question to Mr. Silberman. It was, in fact, known, and the disclosure was made in May of 2015, months prior to the entry of the judgment, that she was anticipating receiving these inheritances, and they would be likely between $750,000 to $1 million. Mr. Connelly is a financial advisor, and as I outlined in my brief, he filed a motion to modify temporary child support because my client's family was taking their investments away from him. He knows that if you lose investments, you lose your income because the investments generate the income. It's disingenuous to sit before the court and say, even as a financial advisor, who makes my money this way? I had no idea that for roughly $1 million, she would wind up having any income. More importantly, Petitioner's Exhibit No. 2, which was admitted during the course of the hearing, was the disclosure of at least one of the accounts which my client knew she was going to be inheriting from her great aunt's trust. According to that exhibit, it reflects the fact that roughly $30,000 of dividend income was received per year from four investments, almost $27,000 of that just from Fort Morris alone. So to say that Mr. Connelly was surprised that this was an income-generating asset, I think, again, is disingenuous. Then let's take it another step further. The parties are each required to exchange their tax returns every year. In 2016, Mr. Connelly never filed any type of a motion to vacate the judgment or modify support because he now knew exactly what the dividend income was that my client received in 2015 based upon the year, which is when you basically, by year end, you figure out what your dividends are. So when he receives those tax returns, does he do anything? No. He files a motion to modify parenting time, which was in May of 2016. Again, I respectfully disagree with Mr. Silberman. While the court never made a ruling on that motion after mediation failed, there was, in fact, a pretrial conference, which is reflected in the docket sheet, that the court held between Mr. Silberman and myself, made certain recommendations, and eventually the parties landed on an agreed order modifying parenting time. Fast forward 11 months is when the new child support statute goes into effect. Ten days later, Mr. Connelly files a motion to modify child support. He then amends that in October of 2017 after I filed a motion to strike and dismiss that motion, which in essence resolves that aspect of my motion to strike and dismiss. At no point in time, including in his motion to modify parenting time in 2016, did Mr. Connelly request that if his motion were granted and his parenting time be expanded for a deviation downward from the child support guidelines. In August of 2016, when that agreed order is entered, he again does not request a deviation downwards or any other modification of child support. Instead, he waits to try to use the new 2017 statute once that goes into effect. There's nothing wrong with that. There's not necessarily anything wrong with it, but to state that I have all these increased expenses, and I'd like to get to that issue next. Justice Schmitt, I think you opined on that question or asked that question as to what evidence did he provide. Judge Osberger states specifically that he didn't. In fact, on cross-examination, one of the things that he had said was, well, now I have the ZOO Pass, and the ZOO Pass costs more. I said, well, isn't it true the ZOO Pass is the same whether you go once or 10 million times? It truly does not matter. He didn't provide any evidence of any increased expenses, not a bank statement, not a credit card statement. And curiously, though there was substantial questioning to my client about her 2015 income expense affidavit, his wasn't introduced. Not his predecree financial declaration or income expense affidavit, not anything from 2016, only the requisite 2017-2018. So we're basically now stuck in a situation where Mr. Collins is saying, well, it is more. However, he admitted during cross-examination he doubled his real estate tax payments. He almost tripled his mortgage payment. All of these things voluntarily after the entry of the judgment for dissolution of marriage. Those are the real increase of his expenses. And never once did he say, I had to get a bigger house so that I could afford my additional parenting time. In fact, the motion in 2016 reflects the fact that the parties only lived four miles apart from each other which was in December of 2017. So it's in essence a statement of, I promise there is these changes in my expenses, but there's actually no substance or no evidence introduced other than his testimony. And because this is a manifest way to the evidence standard, the trial court was in the best position to determine whether or not Mr. Connelly was a credible witness. And at least one portion of Judge Osterberger's decision, that dealing with his alleged professing that he had no knowledge of the income that may be generated from my client's inheritance assets, she specifically called the assertion specious at best. So that, combined with the examination of Mr. Connelly, has a direct impact on whether or not the court found that he approved a substantial change in circumstances. The next aspect which counsel argues, and Mr. Connelly argued before the trial court, is what the effect of his increased parenting time is. There is a judicial decision on this. Judge Osterberger determined that he has 138 overnights in one year and 137 in the other. This was also an issue that was litigated. And the record actually reflects Judge Osterberger asking us to tender to her our proposed calendars of what we believe Mr. Connelly's parenting time was for day two of our hearing. So day one was kind of a ridiculousness over what time do you start Christmas on and some cross petitions for rule of show cause. Day two we were getting into the substance of this appeal, the modification of child support. Those calendars are not in the record, but they were submitted, and the record reflects the fact that she asked us to tender them, and they were tendered to her. She again heard evidence, both of my client and Mr. Connelly. She saw talking parents, which is an act that the parent parties use so nobody can delete her to try to say that you told me this or I'd never do this type of communication instead of just picking up the phone because parents can't do that quite as well anymore and the Internet has saved us, I guess. But those talking parents actually also impeached Mr. Connelly's calendar and his testimony. So when you go from his pleading, I have 165 overnights, to hearing commencing, well, I'm at 151. And then I cut off my cross-examination based upon the way the hearing was going in May, having demonstrated additional overnights that he actually didn't have, that his calendar, which is part of the record, reflects, demonstrates that this is a situation wherein there's a genuine question that the trial court had to determine as to what his overnights were. Because it's not just the overnights that you're assigned. You actually have to exercise them as well under the new Section 505 and 510 to determine if you hit the magical, mystical number of 146 overnights to have your child support substantially reduced. Well, and if you've got one parent's, hypothetically, let's suppose they get some extra days and their expenses go up. But that doesn't necessarily mean that the other parent's expenses go down. Correct. It's a basic law of economics of it's cheaper for one to live than three, but it's not like you're going from three on a single basis to just one constantly. I mean, again, it's just kind of, we all know this from prior case law, that it's a simple law of balancing economics of how it is for families to live. Your mortgage doesn't go down, your mortgage doesn't go up, because your kids are at dad's house two extra days. And so to say that her expenses went down, again, is frankly just speculative in terms of, okay, well, maybe you didn't have to feed the kids one more night or an extra night, but that also doesn't mean that Mr. Conley had to shop at Mario's instead of Aldi or take the kids out to eat at McDonald's instead of making ham sandwiches at home. So to say that my expenses have gone up with actually no supporting documentary evidence and just say, well, it was unrebutted because I said so, I don't think that's what unrebutted means. Unrebutted means looking at whether or not there isn't a question. And I think, frankly, the cross-examination fleshed out a lot of those issues of what he didn't produce. And Judge Osterberger's order even specifically goes into that, in the fact that there was no clear and specific evidence as to whether or not his expenses had indeed gone up based upon his increased amount of parenting time. So when examining the record as a whole and the three different allegations that Mr. Conley alleged constitute the substantial change in circumstances in order to get under the new Section 505, excuse me, the new Section 510, they simply weren't there. And that's why Judge Osterberger, on motion, granted a directive finding. And this case ended at that point in time in terms of this request to modify child support. And there is – I'm sorry? Ended in the trial court, at least for now. We'll go that way. So when dealing with this and saying that he has all these additional overnights, I mean, frankly, there's nothing to demonstrate that Judge Osterberger's conclusion was wrong. She went through. She took a calendar. She heard the evidence. She heard the testimony. She saw the demeanor of the parties. She made a finding. And I don't believe there's a sufficient record to reverse her finding as it relates to that amount of overnights. So taking either any one of the three or all three combined allegations as to what constitutes the substantial change in circumstances, I don't believe they met their burden at the trial court, and I certainly don't believe that they met their burden to demonstrate that Judge Osterberger's decision was against the manifest weight of the evidence. If there's no other questions. Thank you very much. Thank you. Mr. Silverman, to rebut. Thank you again. First, there is evidence within the record that the testimony that was unrebutted by Ms. Connolly and Mr. Connolly established that he had, in 2017, 149 overnights. He had listed 151. On cross-examination, Mr. Junker was able to ask questions with regards to talking parents, and it reduced to 149. My point in saying that is that Judge Osterberger's determination that there was less than 130 or 131 overnights is just as palpably untrue. It's mathematically impossible based on the allocation of parenting time between parties. That's why the chart that I put in the brief outlined specifically the amount of parenting time, and I didn't want to belabor the point, but I just wanted to make it clear. Okay. Let me ask you, you know, let's talk about this. Yes, Judge. And I got no problem with, you know, lawyering. That's what you all are hired to do. But if you want to know, what happens, I think, if a husband goes to a wife and says, hey, darling, I'd like to have another 20 days with my kids next year, and I want to reduce my child support payment in turn as a result of that. How many wives do you think are going to agree with that? What do you think the chances are of getting an agreed order? I wouldn't say you'd get an agreed order. You'd get an agreement outside the court, and you wouldn't, in fact, your child support obligation. And I agree with you completely, right? Just completely. But in this particular point, we're talking about a court order that provided Mr. Connolly an additional 31 overnights. Now, the reason why Mr. Jumbach had said he had up to 165 is because he went through his calendar, and the days that Ms. Connolly had offered him that were not assigned to him, he added to the 165. So that's why that number was not inflated, but that was the actual number for that particular year. Now we're in a situation where if we actually look at the allotted time that he's assigned by the judge, he meets now the threshold for shared parenting, which would be 156. But that's more of a tangential issue in the overall substantial change in circumstances. That's one. The other two happen to deal with, or the predominant one happens to deal with Ms. Connolly's income. It was not contemplated in the marital settlement agreement by any stretch of the imagination that she would receive dividends, interest income, or any other source of passive income, as it was never stated on her income expense affidavit prior to the entry of the judgment, which was the closest time at which we could review. So in other words, a financial advisor is quite shocked that the receipt of certain assets could generate income. I wouldn't say. Quite shocked, the financial advisor. My client? I wouldn't say that. I would say that he was unaware, as I was, with what she would do with her assets, meaning she was moving the assets away from my client as the financial advisor. She was hiring another firm, another company, another financial advisor, and they could at that point reinvest the securities. They could restructure her portfolio. There was never a guarantee. There was never a discussion as it related to what the dividends or passive income would be on an annual basis. And the issue was substantial. The letter that's in evidence that has this hearsay document from, I believe it's Morgan Stanley, is one page, and it was provided in a settlement negotiation to discuss parenting issues. And then there was a line at the end that said, in close please find the documentation with regards to her inheritance, because I had issued discovery, et cetera, with regards to what is the amount that she will receive. In this particular document, which wasn't sent for the purpose of establishing her dividend or passive income, it states specifically on a line item that it is speculative, anticipated. It doesn't say she will receive it at all. And again, she just speculated how much is how much was that? The speculative. I'm trying to determine the year if it was 16 or 17, but she received $23,232 of dividend income, I want to say in 2017, because we never received 2018 by the time the hearing occurred. But it was not for the exchange of that document was not for purposes of establishing, as we never discussed it. And Mr. Connolly testified. Yes, he's a financial advisor. There's a number there. Yes, but it's not concrete. It literally says speculative. Let me just say this about concrete for a minute. Sure. What evidence did you give the court of specifically how her expenses related to raising those kids were abated by virtue of your client having more time with her? Her income expense affidavit. She had listed on her an income expense affidavit, certain expenses that had increased as a result of also Ms. Connolly moving, but then also expenses for the children that had decreased as a result of Mr. Connolly picking up or paying a portion of the expenses. And what was the net result? Would there have been increases or decreases? Where do we end up on that affidavit? I don't, but in the end, they split their agreed upon expenses. 50-50. The issue with the, I look at it twofold, and I hope I'm answering your question this way. The trial court looked at her, didn't comment on her income at all. At all. Other than saying she received $75,000 and a bonus. She didn't even, the court didn't even state what the bonus was. It's $75,000 plus $5,000, which is now $80,000. At the time of the judgment in 2008. Have you been introduced to what the bonus was? Yes, I introduced that. Okay. And the trial court made the comments after the hearing, after the evidence. I'm sorry. The trial court made the comments after the evidence. The trial court ignored the bonus and said specifically that she earned $75,000 and a bonus and investment income, but didn't quantify what the bonus was or what the massive passive income was. Because at the time of the judgment in 2015, she was at $60,000, give or take. Was there a dispute about what her bonus was? Yeah, it was $5,000. But it wasn't. There was no dispute. There was no dispute, but it also wasn't in the judge's order. So my issue with that is, well, if you look at $75,000 plus $5,000, you get to $80,000. Now you're looking at over $20,000 of passive income. You're over $100,000. Mr. Connolly earns $110,000. That's a substantial increase of almost 50% of Ms. Connolly's income for purposes of support. Because for purposes of support, it's income from all sources. Time. I appreciate the time. Thank you very much. Thank you, Mr. Silverman. Thank you, Judge Beck. Thank you also. We'll take this matter under advisement. This position will be issued. And we're going to recess for a minute here. So screw it up. For a panel change before the next case.